# IN THE TENNESSEE COURT OF CRIMINAL APPEALS

## AT JACKSON

### JUNE SESSION, 1999

FILED

August 12, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

ERSKINE LEROY JOHNSON,   )   C.C.A. NO. 02C01-9707-CR-00292
                        )
    Appellant,          )   SHELBY COUNTY
                        )
VS.                      )
                        )   HON. WILLIAM H. WILLIAMS, JUDGE
STATE OF TENNESSEE,      )
                        )
    Appellee,           )   (Post-Conviction, Death Penalty)
                        )

**FOR THE APPELLANT:**

**JONATHAN I. BLACKMAN**
**DAVID E. BRODSKY**
**CLEARY, GOTTLIEB, STEEN & HAMILTON**
One Liberty Plaza
New York, NY 10006

**JOSEPH S. OZMENT**
217 Exchange Avenue
Memphis, TN 38105

**FOR THE APPELLEE:**

**JOHN KNOX WALKUP**
Attorney General and Reporter

**AMY L. TARKINGTON**
Assistant Attorney General
425 5th Avenue North
Nashville, TN 37243-0493

**WILLIAM L. GIBBONS**
District Attorney General

**JOHN W. CAMPBELL**
Assistant District Attorney General

**LORRAINE CRAIG**
Assistant District Attorney General
Criminal Justice Center, Suite 301
201 Poplar Avenue
Memphis, TN 38103-1947

**OPINION FILED _____**

**AFFIRMED IN PART; REMANDED FOR RESENTENCING**

**JOE G. RILEY,**
**JUDGE**

# OPINION

In this capital case, Defendant, Erskine Leroy Johnson, appeals as of right from the judgment of the Criminal Court of Shelby County denying his post-conviction relief petition. In 1985, he was convicted of one count of felony murder and sentenced to death by electrocution. His conviction and sentence were affirmed on direct appeal by the Supreme Court. *See* State v. Johnson, 762 S.W.2d 110 (Tenn. 1988), *cert. denied,* 489 U.S. 1091, 109 S.Ct. 1559, 103 L.Ed.2d 862 (1989). On appeal, Defendant raises the following issues:

1.  whether the State failed to disclose exculpatory evidence relating to guilt and sentencing in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963);

2.  whether the trial court erred in finding that the issue of whether the State had unconstitutionally discriminated in the exercise of its peremptory challenges had been previously determined;

3.  whether the trial court erred in denying Defendant's request for leave to take discovery and present evidence regarding the peremptory challenge issue;

4.  whether Defendant was denied the effective assistance of counsel at the guilt and penalty phases of his trial;

5.  whether Defendant is entitled to be resentenced based on a Middlebrooks error;

6.  whether the trial court properly instructed the jury;

7.  whether the death penalty statutes are unconstitutional; and

8.  whether the cumulative effect of all errors at the trial and sentencing hearing violated due process.

After reviewing the record, we conclude the state improperly withheld material, exculpatory evidence relating to the penalty phase of the trial. The state argued to the jury that Defendant fired the shot that grazed an innocent bystander, thereby leading to the application of the aggravating circumstance of creating a great risk of death to others. A crime scene report, improperly withheld from the defense and the jury, revealed arguably contrary information. This error, combined with the undisputed and erroneous application of the felony murder aggravator, necessitates a **REMAND** for a new sentencing hearing. In all other respects, the judgment of the trial court is **AFFIRMED**.

**Background**

The proof, as set forth in the supreme court's decision, <u>Johnson</u>, 762 S.W.2d at 115-16, established that between 8:30 and 9:00 a.m., on October 2, 1983, Joe Belenchia, owner of a Food Rite grocery store in Memphis, was killed in the course of an attempted armed robbery. Tommy Perkins, an eyewitness to the robbery, made an in-court identification of Defendant as the person who killed Mr. Belenchia. He had also made a pre-trial identification of Defendant from a photo display. He further identified Jerome Moreland, a friend of Defendant, who was also involved. Mr. Perkins was not one hundred percent sure of his identification at trial and ?pretty sure" of his pre-trial identification. He had also seen a burgundy-colored station wagon in the store parking lot on the day of the robbery with two people in the front and two in the back. One of the passengers in the rear seat was a female. This vehicle was subsequently linked to the crime.

Earlier on the morning of the robbery, Harold Quarles, a young boy, saw a man switching license plates from a car parked in the street to a maroon station wagon. Three people were in the station wagon, and the man switching the license plate was seen talking to a woman in a white car. The number on the license plate was the same as the number on the vehicle used in the robbery. A palm print taken from this vehicle was subsequently identified as Defendant's.

Defendant was wearing an orange or rust-colored suede or leather jacket, which was identified by at least two witnesses to the robbery. Another witness in the grocery store at the time of the robbery testified that a woman accompanied by a man attempted to enter the store office. She was prevented from doing so by the security guard who in turn was restrained by the man, who put a gun to his head. At that time, the witness heard the sound of three shots coming from the front of the store.

During the police investigation, the maroon station wagon was traced to the St.

Louis Airport. Defendant's cousin, Elizabeth Starks, testified that Defendant and another man named "Jerome" came to her home the night before the homicide. They were traveling in a maroon station wagon. The next morning, Defendant, Jerome, and another man came to her residence. Her boyfriend, Dennis Williams, went with the three men to the store for cake mix about 7:00 a.m. When Mr. Williams returned, he was pale and acted exhausted and upset. Subsequently, Defendant, Jerome, and a third man returned to her house. A woman in a white car also came there.

Beverly Batts, Defendant's former girlfriend, testified that several months later, Defendant told her he and two friends had stolen a car from the St. Louis Airport. He admitted he had committed a robbery and murder in Memphis.

Defendant offered an alibi defense through a number of witnesses who testified that on the night of October 1, 1983, and the morning of October 2, 1983, he was in St. Louis at a birthday party for his mother. Defendant testified that he attended the birthday party and on the following morning took his children to his mother's house in order to attend church. He denied knowing Ms. Starks and said that Ms. Batts told him she would keep him in jail because he refused to pay her bail in California.

## Post-Conviction Standard of Review

In this post-conviction proceeding, the burden was on Defendant to prove the allegations contained in his petition by a preponderance of the evidence. State v. Kerley, 820 S.W.2d 753, 755 (Tenn. Crim. App. 1991); Oliphant v. State, 806 S.W.2d 215, 218 (Tenn. Crim. App. 1991). Findings of fact and conclusions of law made by the trial court are given the weight of a jury verdict, and this Court is bound by those findings unless the evidence contained in the record preponderates otherwise. Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). This Court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the trial court. Questions concerning the credibility of witnesses and weight and value to be given their testimony are for resolution

by the trial court. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990).

## I. ALLEGED BRADY VIOLATIONS

Defendant contends that the State withheld evidence in violation of Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). The Defendant made a pre-trial request for exculpatory evidence, and the State responded that it had no exculpatory evidence. He contends this withheld evidence would have shown that another "group" committed these offenses; this could have strengthened his alibi defense; and it could have been used to impeach Beverly Batts, who testified for the State that Defendant had confessed to the murder. He asserts that the exculpatory evidence withheld was extensive and interlocking, and that there is a reasonable probability that if the jury had heard this exculpatory evidence, it would have had a reasonable doubt about whether Defendant was the person who shot the victim.

### A. Brady v. Maryland

In Brady v. Maryland, the United States Supreme Court held that any ?suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196-97. The duty to disclose extends to all ?favorable information" regardless of whether the evidence is admissible at trial. State v. Marshall, 845 S.W.2d 228, 232-33 (Tenn. Crim. App. 1992); Branch v. State, 469 S.W.2d 533, 536 (Tenn. Crim. App. 1969). In United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985), the Supreme Court held that both exculpatory and impeachment evidence fall under the Brady rule.

Before an accused is entitled to relief under this theory, he must establish several prerequisites: (a) the prosecution must have suppressed the evidence; (b) the evidence suppressed must have been favorable to the accused; and (c) the evidence must have

been material.  *See* <u>Bagley</u>, 473 U.S. at 674-75, 105 S.Ct. at 3379-80;  <u>Brady</u>, 373 U.S. at 87, 83 S.Ct. at 1196-97; <u>State v. Edgin</u>, 902 S.W.2d 387, 390 (Tenn. 1995); <u>Workman v. State</u>, 868 S.W.2d 705, 709 (Tenn. Crim. App. 1993); <u>Strouth v. State</u>, 755 S.W.2d 819, 828 (Tenn. Crim. App. 1986).  Evidence is considered material only if there is a "reasonable probability" that, had the evidence been disclosed to the defense, the results of the proceeding would have been different.  <u>Bagley</u>, 473 U.S. at 682, 105 S.Ct. at 3383.

In order to prove a <u>Brady</u> violation, a Defendant must show that ?the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Kyles v. Whitley</u>, 514 U.S. 419, 435, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995); *see also* <u>Strickler v. Greene</u>, ___ U.S. ___, ___, 119 S.Ct. 1936, 1952 (1999); <u>Edgin</u>, 902 S.W.2d at 390.  The Court in <u>Kyles</u> urged that the cumulative effect of the suppressed evidence be considered to determine materiality.  514 U.S. at 436, 115 S.Ct. at 1567.

The State is not required to disclose information that the accused already possesses, is able to obtain, or information which is not possessed by or under the control of the prosecution or another governmental agency.  <u>State v. Marshall</u>, 845 S.W.2d at 233.  Under <u>Brady</u>, the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police.  <u>Kyles</u>, 514 U.S. at 437, 115 S.Ct. at 1567.

**B.  Evidence Pointing Toward a Different Group of Suspects**

Lieutenant Charles Shettlesworth of the Shelby County Metropolitan Police was assigned to investigate the murder.  He testified that Mrs. Johnnie L. Wilborn, a customer in the grocery store during the robbery, was interviewed and shown twenty-four photographs, including a photograph of Defendant.  All the photographs used in the line-up were real suspects in the case.  Mrs. Wilborn picked out a photograph of Michael Brown as looking like the gunman; however, she was unable to make a positive identification at

the time she was interviewed by the police, stating that she had blocked the gunman's face out of her mind. Because she could not make a positive identification, the police did not have her sign the back of the photograph of Michael Brown. Mrs. Wilborn was also unable to make an identification at the post-conviction hearing.

Harold Quarles, who testified at trial, had also been shown a photographic line-up by the police. He had identified Michael Brown and Charles Keller, who were cousins, as looking like the two individuals he saw changing the license plate on the getaway vehicle before the shooting occurred. He was also unable to make positive identifications; therefore, the police did not have him sign the back of the photographs.

Finally, evidence showing that the getaway car was connected to Eric Brown, Michael Brown's brother, was not provided to the defense. Miles McKinney was interviewed by the police and identified the getaway vehicle as being used by Darvi Cunningham, a prostitute working for Eric Brown, months before the shooting. There was also evidence that Eric Brown, Michael Brown, and Charles Keller were involved in a car theft ring which stole rental cars from the St. Louis Airport. Their involvement with the getaway car was corroborated by the fact that the vehicle had been driven over 10,000 miles within the three months it had been stolen. It was also corroborated by proof showing that the vehicle had been driven to Chicago, which was consistent with proof that Eric Brown and Darvi Cunningham traveled to various truck stops for purposes of prostitution. No fingerprints belonging to Eric Brown or Michael Brown were found on the car.

It is undisputed that the defense requested all exculpatory evidence and that the State responded that it had none in its possession. Originally, the Defendant was represented by the public defender's office. Thereafter, Robert Paskal and J. Michael Benson of the Missouri Bar were retained to represent Defendant at trial. The files of the public defender's office indicate that they had interviewed Mrs. Wilborn and Harold Quarles, but the summaries of these interviews do not reflect that either indicated they had

picked out photographs of Michael Brown. The summaries only show that neither made positive identifications. Mr. Benson testified at the post-conviction hearing that Defendant had asked defense counsel to contact Eric Brown. Mr. Benson spoke with Eric Brown and found out that the police had questioned him regarding this shooting; however, it was decided that his testimony would not be helpful. There is no indication that defense counsel had knowledge of Eric Brown's possible connection to the getaway vehicle.

The State possessed information regarding Michael Brown, Charles Keller, Eric Brown, and their possible connection to the shooting and to the getaway vehicle. Moreover, while the defense's request for exculpatory evidence did not specifically request such information, the State responded that it had no exculpatory evidence in its possession. Thus, the only questions remaining are whether this evidence is exculpatory, and if it is exculpatory, whether the information is material.

In denying relief, the post-conviction court concluded that the "identification" proof was not favorable to Defendant. Although Mrs. Wilborn was unable to make a positive identification of Michael Brown as the shooter, she did pick his photograph out of a photographic line-up, which included a photograph of Defendant. Obviously, this information would have been favorable to Defendant. Harold Quarles was unable to make positive identifications of Michael Brown or Charles Keller as the men he saw with the getaway vehicle on the morning of the shooting; however, he picked their photographs out of a photographic line-up which included a photograph of Defendant. Again, this information was favorable to Defendant.

This conclusion is solidified by the State's presentation at trial of Tommy Perkins, an eyewitness to the shooting. Mr. Perkins picked out a photograph of Defendant when shown a photographic line-up by the police, but he too was unable to make a positive identification. Moreover, he was unable to make a positive in-court identification of Defendant. Regardless, the State chose to present his testimony at trial. Accordingly, if Mr. Perkins's less than positive identification was favorable proof of Defendant's guilt, then

less than positive identifications made by Mrs. Wilburn and Mr. Quarles of different suspects were favorable to Defendant's defense. The additional information regarding a potential connection between Eric Brown, Michael Brown, and Charles Keller with the getaway vehicle would also have been favorable to Defendant in conjunction with the identifications made by Mrs. Wilburn and Mr. Quarles.

Nevertheless, while this information was clearly exculpatory, it does not meet the Brady materiality standard. In order to prove a Brady violation, Defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 419, 115 S.Ct. at 1558; *see also* Strickler, ___ U.S. at ___, 119 S.Ct. at 1952.

Having reviewed the proof presented at trial and at the post-conviction hearing, we find that confidence in the guilty verdict has not been undermined by the State's failure to disclose this exculpatory evidence. The circumstantial proof linking Defendant to this shooting is strong. In addition to Mr. Perkins's identification of Defendant as the shooter, Defendant's palm print was found on the getaway car. Moreover, despite Defendant's claim that he was in St. Louis at the time of the shooting, his cousin, Elizabeth Starks, identified him as being in Memphis on the day of the shooting and identified him as being in the getaway car. She further testified that she and a friend had been in that car prior to the robbery. Her testimony was corroborated by the presence of their fingerprints in the car. Furthermore, Beverly Batts testified that Defendant confessed to a "cold-blooded" shooting in Memphis.[1]

In addition, the eyewitness descriptions of the assailant were similar. Perkins described the assailant as 5'11", 145-50 pounds. The wife of the victim described him as 5'10-11" with a slim build. Wilburn described him as about 5'6", medium height. The post-conviction court noted

---

[1]Defendant also points to a third group of individuals who could have been implicated in the shooting; however, the proof at the post-conviction hearing was too minimal and insufficient to raise a question of materiality.

> [Defendant] was 68 inches in height and 135 pounds.
> Michael Brown's ... height was 78 inches and [he weighed] 175
> pounds. Clearly, the differential in height of the two eliminated
> Michael Brown as any possible suspect in the case ... The
> record is clear that Michael Brown was not the shooter in this
> robbery/killing.

It is apparent that the descriptions given by the eyewitnesses would have been different

if the assailant had been 6'6" (78 inches) tall, the height of Michael Brown.

The evidence does not preponderate against the findings of the post-conviction

court. The identification by Perkins, the corroborated testimony of Starks, Defendant's

admission to Batts and Defendant's palm print on the getaway car have not been

overcome. The failure of the state to reveal the less than positive photographic

identifications of Brown does not undermine confidence in the outcome of the proceeding.

Nor does the failure to reveal the Browns' and Keller's connection to the car undermine

confidence in the verdict.

## C. Elizabeth Stark's Statement

Defendant next contends that the State withheld Elizabeth Starks's initial statement

to the police in which she indicated that she did not recognize Defendant as one of the

men who came to her home on October 1, 1983. Although the record is unclear as to

exactly what defense counsel did receive prior to the cross-examination of Starks, defense

counsel cross-examined her concerning the inconsistencies between the two statements.

Starks conceded the statements were inconsistent. Defendant has failed to establish a

reasonable probability of a different result even if defense counsel had received further

details of the first statement.

## D. Palm Print Reports

Defendant also contends that the State withheld information regarding his palm print

taken from the getaway vehicle. Specifically, the State did not provide Defendant with a report showing that Defendant's fingerprints did not match any of the fingerprints removed from the vehicle or with a report listing the places from which the prints were lifted, on which the palm print was not listed.

In Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed. 2d 490 (1995), one of the complaints made by the defense was that the State failed to provide him with a list of cars parked at a grocery store. It had been argued to the jury that the killer drove to the grocery store parking lot and left his car there during the heat of the investigation; however, Defendant's car was not on the list. The State argued that the evidence was neither impeachment nor exculpatory evidence because Defendant could have moved his car before the list was created, and the list did not purport to be comprehensive. The Supreme Court rejected this argument, stating that it "confuses the weight of the evidence with its favorable tendency, and even if accepted would work against the State, not for it." Id. at 451, 115 S.Ct. at 1574. The Court noted that while the suppression of this evidence did not rank with the failure to disclose other evidence in the case, it would have had some value as exculpation and impeachment, and it counted accordingly in determining whether Bagley's standard of materiality was satisfied. Id. at 450, 115 S.Ct. at 1573.

Accordingly, the police reports in the present case were also exculpatory. Based on Kyles, the failure to provide the defense with these police reports must be considered in determining the cumulative effect of the State's failure to provide exculpatory evidence. However, the State's failure to provide the defense with these police reports does not undermine the confidence in the jury's verdict.

**E. Evidence to Impeach Beverly Batts**

Defendant submits that the State withheld information that Beverly Batts had been

promised expungement of her California record in exchange for her testimony against Defendant in Tennessee. This claim is without merit.

In Giglio v. United States, 405 U.S. 150, 154-55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972), the Supreme Court held that impeachment evidence falls under the Brady rule. *See also* State v. Davis, 823 S.W.2d 217, 218 (Tenn. Crim. App. 1991). Moreover, under State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992), the State is required to provide information which is possessed by or under the control of the prosecution or another governmental agency. *Id.*

Ms. Batts's statement, which was taken in connection with these post-conviction proceedings, was presented as proof that she had been offered a deal. She stated that at the time of the trial, she thought that California was going to expunge her record in exchange for her testimony in Tennessee; however, her record was never expunged. In any event, no authorities from California testified nor were documents offered as proof of a deal made with Ms. Batts. In addition, there is no proof that the authorities in Tennessee were aware of an alleged deal made by the authorities in California. Accordingly, because the record does not support a finding that this information was in the possession or under the control of the State, it was not subject to the Brady rule.

### F. Cumulative Effect on the Verdict of Guilt

While the Court finds that the State withheld exculpatory evidence regarding other potential suspects, the cumulative effect of the information withheld does not require reversal of the jury verdict because, taken as a whole, the suppressed information is not material. Defendant has failed to show that disclosure of the suppressed evidence to counsel would have made a different result reasonably probable. As previously stated, the key proof implicating Defendant in this shooting included Defendant's palm print found on the getaway vehicle; Ms. Starks's testimony placing Defendant in Memphis on the day of the shooting and connecting him to the getaway vehicle, contrary to Defendant's testimony

that he had been in St. Louis; and the one eyewitness who testified that Defendant looked like the person who shot the victim. Defendant also fit the physical description given by the witnesses at the grocery store. Furthermore, Defendant confessed to Ms. Batts that he had shot and killed a man in Memphis. Accordingly, we find that the withheld exculpatory evidence was not material, and reversal of the jury verdict is not required.

## G. Great Risk Aggravating Circumstance

Regarding the sentencing hearing, Defendant contends that the State withheld exculpatory evidence relevant to the application of the ?great-risk" aggravating circumstance. The jury found that "[t]he Defendant knowingly created a great risk of death to two or more persons, other than the victim murdered, during his act of murder." See Tenn. Code Ann. § 39-2-203(i)(3)(1982).

Defendant contends that the State withheld a police report showing that the bullet which grazed a young woman near a ?PacMan" machine in the grocery store was not fired from the checkout area, and that the State withheld the fact that the victim had a loaded gun in his pocket. Specifically, he contends the crime scene report would have contradicted the prosecution's theory for establishing the great risk of death aggravating circumstance, and the fact that the victim was armed would have contradicted the prosecution's argument that the victim was defenseless.

At the post-conviction hearing, a crime scene report was introduced into evidence. The report indicated that the shot fired through the PacMan machine, grazing the young woman nearby, was fired from the area of the grocery store's front doors and not the checkout area. Furthermore, the photographs showed solid obstructions between the checkout area, where Defendant was during the shooting, and the PacMan machine. This is contrary to the State's trial theory. In fact, Sergeant Frank J. Wheeler of the Memphis Police Department testified at trial that there were no solid obstructions between the checkout area and the PacMan machine. At the sentencing hearing, the prosecution

argued that the shot grazing the young woman supported application of the ?great-risk" aggravating circumstance.

Robert A. Poole, with the Dallas County Crime Lab, testified at the post-conviction hearing. After reviewing the police reports, the crime scene photographs, witnesses' statements given to the police, and the transcripts of evidence, it was Mr. Poole's expert opinion that it was more likely than not that the person who shot the victim was not the person who fired the shot through the PacMan machine at the back of the store. The PacMan machine was not visible from the area of the checkout; therefore, where the bullet entered and exited the video machine was not visible or accessible to the person firing shots in the checkout area. The withheld crime scene report stated that the bullet "struck and penetrated the cabinet side [of the PacMan machine] at at [sic] an angle of 15.5 [degrees] from the front doors of the store and one bullet was fired from some point along this line." Mr. Poole testified that he could say with reasonable scientific certainty that the gunman who shot the victim did not fire the bullet that hit the video machine and grazed a customer.

## H. Vicarious Liability Under the Great Risk Aggravator

The state contends it is irrelevant whether the Defendant or an accomplice fired the shot that grazed the innocent bystander. The state argues that any defendant who is a willing and active participant in a robbery is accountable for all consequences flowing from that robbery, including the application of the aggravating circumstance of creating a great risk of death to two (2) or more persons. We disagree.

The requirement that the prosecution disclose exculpatory evidence applies not only to guilt but also to punishment, irrespective of the good faith or bad faith of the prosecution. Brady, 373 U.S. at 87, 83 S.Ct. at 1196-97. Furthermore, the prosecution is responsible for the disclosure of exculpatory evidence even if it is only in the police files. Kyles, 514 U.S. at 438, 115 S.Ct. at 1568.

We are unable to agree with the state's contention that it was irrelevant to the jury's determination whether it was the Defendant or an accomplice that fired the shot that placed the bystander in danger. The state's reliance upon Middlebrooks is misplaced. Certainly, a defendant who is a willing and active participant in a robbery is accountable for the consequences flowing from the robbery and may be convicted of felony first degree murder where a co-perpetrator is the actual killer. State v. Middlebrooks, 840 S.W.2d 317, 336 (Tenn. 1992). However, Middlebrooks does not hold that this theory of liability also applies to all aggravating circumstances.

The felony murder aggravating circumstance in effect at the time of this homicide specifically included "an accomplice in the commission of ... robbery." Tenn. Code Ann. § 39-2-203(i)(7)(1982). The great risk aggravating circumstance, on the other hand, required that "[t]he defendant knowingly created a great risk of death to two or more persons, other than the victim murdered, during his act of murder." Tenn. Code Ann. § 39-2-203(i)(3)(1982).[2]

In 1982, the United States Supreme Court addressed the issue of vicarious liability in a felony murder in Enmund v. Florida, 458 U.S. 782, 797, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982). The Court's holding prohibited the institution of the death penalty on a non-triggerman based solely upon his participation in the underlying felony. Justice White, the author of the majority opinion, wrote, "the imposition of the death penalty on one such as Enmund who . . . does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed" is constitutionally prohibited. Enmund v. Florida, 458 U.S. at 797, 102 S.Ct. at 3376.

Within five years of promulgating this apparent bright-line standard, the Court in Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), dramatically refined the Enmund intent rule in a felony murder and held that "major participation in the

---

[2]The current great risk aggravator is identical except for its reference to "the act of murder" rather than "his act of murder." *See* Tenn. Code Ann. § 39-13-204(i)(3)(1997).

felony committed, combined with reckless indifference to human life" demonstrated culpability sufficient for execution. Tison v. Arizona, 481 U.S. at 158, 107 S.Ct. at 1688. Thus, after Tison, nearly all defendants convicted of felony murder, both killers and non-triggermen, became death eligible. Indeed, a death penalty may be imposed in a felony murder

> where a defendant kills, attempts to kills, intends that a killing take place, or that lethal force will be imposed, or where a defendant's personal involvement in the underlying felony is substantial and who exhibits a reckless disregard or indifference to the value of human life.

State v. Howell, 868 S.W.2d 238, 265 (Tenn. 1993) (Reid, J., concurring) (citing Tison v. Arizona, 481 U.S. at 137, 107 S.Ct. at 1676; Enmund v. Florida, 458 U.S. at 797, 192 S.Ct. at 3377; State v. Brannam, 855 S.W.2d 563, 570-571 (Tenn. 1993); State v. Middlebrooks, 840 S.W.2d 317, 338 (Tenn. 1992)).

Despite its apparently broad holding, Tison did not relax the constitutional mandate against the arbitrary administration of the death penalty and, particularly, did not address the vicarious application of aggravating circumstances other than felony murder. The Supreme Court has emphasized that, to justify imposition of the death penalty, capital sentencing decisions must focus "on the *circumstances of each individual homicide* and *individual defendant*." Profitt v. Florida, 428 U.S. 242, 258, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1976) (emphasis added).

Thus, once the threshold determination of Enmund-Tison has been satisfied, *i.e.*, "major participation combined with reckless indifference to human life," rendering the defendant death eligible, the defendant may constitutionally be held vicariously accountable for the circumstances of the offense, even if he was not the cause or the actor responsible for the particular aggravating circumstance. However, this premise is not absolute; rather, it is subject to statutory limitations. Tennessee has chosen to constitutionally narrow the class of death eligible defendants by statutorily listing a number of specific aggravating circumstances and expressly requiring the finding of at least one aggravating circumstance beyond a reasonable doubt before the death penalty can be imposed. *See* Tenn. Code Ann. § 39-2-203(g) (1982); *see also* Middlebrooks, 840

S.W.2d at 344.

In order to establish the presence of the statutory aggravating circumstance at issue in the present case, the State must establish that "[t]he <u>defendant</u> knowingly created a great risk of death to two or more persons, other than the victim murdered, during <u>his</u> act of murder." Tenn. Code Ann. § 39-2-203(i)(3) (emphasis added). The plain language of this provision, "read in context of the entire statute, without any forced or subtle construction which would extend or limit its meaning," *see generally* <u>State v. Cauthern</u>, 967 S.W.2d 726, 735 (Tenn. 1998); <u>State v. Johnson</u>, 970 S.W.2d 500, 505 (Tenn. Crim. App. 1996), *perm. to appeal denied* (Tenn. 1997), clearly focuses on the defendant's *own actions or intent* and contemplates consideration of the defendant's *individual* actions in determining the most culpable capital defendants. <u>Cf</u>. <u>State v. Hall</u>, 976 S.W.2d 121, 134 (Tenn. 1998) (plain language of (i)(8) aggravator, during defendant's escape from lawful custody, adhered to in construing legislative intent).

The (i)(3) aggravator in effect at the time of this homicide does not impute vicarious liability upon the defendant for the actions of an accomplice.[3] Other statutory aggravators, by their plain language, clearly encompass consideration of the individual *nature and circumstances* of the crime itself, which would permit such a vicarious application. <u>Cf</u>. <u>Ex parte Bankhead</u>, 585 So.2d 112, 125 (Ala. 1991) ('heinous atrocious cruel' aggravating circumstance upheld based on the manner of the killing and not on the defendant's actual participation).

For the foregoing reasons, we conclude that vicarious application of a statutory aggravating circumstance may be constitutionally permissible provided such application is contemplated by the statute. However, the plain language of the aggravating circumstance (i)(3) at issue here does not contemplate such application. Thus, in the present case, if the jury should find that the Defendant's accomplice fired the gunshot

---

[3]We need not decide whether the current great risk aggravator demands a similar result. *See* Tenn. Code Ann. §39-13-204 (i)(3)(1997).

establishing the (i)(3) aggravator, the (i)(3) aggravator cannot be vicariously imputed to the Defendant.

The prosecutor argued to the jury that the Defendant fired the shot that grazed the bystander. The crime scene report that was withheld from the defense and jury indicated the shot was not fired from the location where the victim was murdered, but from the front of the store where the armed accomplice was located. This armed accomplice had put his gun to the head of the security guard prior to the shot that grazed the bystander. Although the state now argues that the Defendant could have fired this shot as he exited the front door, there was no testimony that Defendant fired this shot as he exited the store. It was the jury's responsibility to weigh and consider the aggravating and mitigating factors. *See* Tenn. Code Ann. § 39-2-203(e)(1982); State v. Butler, 980 S.W.2d 359, 362 (Tenn. 1998).

Although there was also proof that there were other customers in the store, we are unable to conclude that the jury would still have applied this aggravating circumstance if it had found the Defendant did not fire the shot that grazed the bystander. We are hesitant to substitute our judgment for that of the jury in view of the evidence withheld from them. Considering this evidence which was withheld from the defense and the jury, along with the erroneous application of the felony murder aggravator as will be more fully discussed hereinafter, we conclude there is a reasonable probability that the jury would have reached a different result as to sentencing.

## I. False Evidence

Defendant further argues that the State knowingly used false evidence; and, therefore, the standard set forth in United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995), should be applied. In Alzate, the court found prosecutorial misconduct and reviewed to see if there was any reasonable possibility that the false evidence affected the jury's decision. *Id*. The proof in Alzate showed that the district attorney general found out that a state's witness had testified falsely, but did not take steps to correct it in rebuttal.

*Id.* at 1108. In the present case, there is no proof showing that the State deliberately used false evidence. This argument is without merit.

### J. Evidence that Victim Had a Gun

Finally, Defendant argues that the State should have disclosed the fact that the victim was carrying a gun at the time of the shooting. This does not establish a <u>Brady</u> violation. A Xerox copy of a photograph of the gun was found in defense counsel's file, indicating that the information had been made available. Moreover, this evidence is neither exculpatory nor material. The unfired gun was found in the victim's pocket, and there is no evidence that the victim attempted or had the opportunity to defend himself. Accordingly, proof of the victim having a gun in his pocket at the time of the robbery would not have refuted the State's argument at trial that the victim was defenseless.

### II. <u>BATSON</u> CLAIM

Defendant argues that the post-conviction court erroneously held that the issue of whether the prosecution used its peremptory challenges to exclude African-American persons from the jury had been previously determined. In <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed 2d 69 (1986), the United States Supreme Court held that "the State's privilege to strike individual jurors through peremptory challenges, is subject to the commands of the Equal Protection Clause." *Id.* at 89, 106 S.Ct. at 1719. Defendant submits that at the time his case was before the Supreme Court, he had not yet been given an opportunity to develop the evidence necessary to establish a *prima facie* case under <u>Batson</u>, which was released while this case was on direct appeal, because the trial court had specifically refused to allow him to make a factual record other than to say that all the jurors and two alternates were white. Therefore, Defendant contends that he has not been given a full and fair hearing on the matter, and the issue cannot be considered previously determined.

## A. Waiver of <u>Batson</u> Issue

Under the Post-Conviction Procedure Act governing this petition, a defendant could raise all constitutional claims except those which had been previously determined, waived, or barred by the statute of limitations. Tenn. Code Ann. § 40-30-112 (repealed and superseded by Tenn. Code Ann. § 40-30-206(g), (h)). In <u>House v. State</u>, 911 S.W.2d 705 (Tenn. 1995), our supreme court held that "a 'full and fair hearing' sufficient to support a finding of previous determination occurs if a petitioner is given the opportunity to present proof and argument." *Id.* at 706. The burden is on the post-conviction defendant to allege facts to overcome the application of procedural barriers. <u>Smith v. State</u>, 814 S.W.2d 45, 49 (Tenn. 1991); *see also* Tenn. Code Ann. § 40-30-104(10) (repealed).

In the present case, the post-conviction court held that this issue had not been waived because it was specifically raised in a proceeding before a court of competent jurisdiction, the Supreme Court. The court went on to find that this fact rendered the issue previously determined and, therefore, inappropriate for post-conviction relief. In support of this determination, the post-conviction court quoted this portion of the supreme court's opinion:

> This case came to trial on 2 December, 1985, approximately three months prior to the time the <u>Batson</u> decision was handed down. . . .However, in <u>Griffith v. Kentucky</u>, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), in two cases in which the exercise of peremptory challenges at trial were the principal issue, the court, in a split decision, held, ?a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a clear break with the past." Therefore, there is no margin for deviation in this case if defendant has made a prima facie showing of discrimination. We hold that he has not.

<u>State v. Johnson</u>, 762 S.W.2d 110, 113 (Tenn. 1988).

As noted by our supreme court on direct appeal, the specific objection made at trial was to the exclusion of potential jurors challenged for cause and excused over defense objection. *Id.* at 112. However, the supreme court went on to address the <u>Batson</u> issue:

There is not an iota of evidence in this record to show this issue was ever presented to the trial court, either at the trial proceeding or at the hearing on the motion for new trial. There was never an objection made on the basis of the prosecutor's removal of black persons from the venire by the exercise of peremptory challenges. The record reflects that the issue was never asserted in the trial court during the venire selection process, or in the impanelling of the jury. There is no reference to the record to support the generalized assertion that the State Attorney exercised peremptory challenges to strike six (6) eligible black persons from the jury panel. There was nothing in that regard called to the trial judge's attention to enable him to rule on the issue.

It would seem to us the appropriate procedure would be to call such matters to the trial court's attention at the time the event occurs in order that a ruling on the issue may be either made or reserved for consideration. This procedure will afford court and counsel the opportunity to note or produce whatever evidence is available. The trial judge can then determine if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

*Id.* at 113-14.

In Griffith v. Kentucky, 479 U.S. 314, 327, 107 S.Ct. 708, 715, 93 L.Ed.2d 649 (1987), the United States Supreme Court gave limited retroactivity to Batson by ruling that it applies to all cases, state and federal, which raised a Batson challenge and which were pending on direct appeal at the time Batson was announced. There is nothing in either of these cases to suggest that a challenge to the unconstitutional exercise of peremptory challenges can be made in other than a timely fashion, that is, prior to the time the jury is actually selected and sworn. Here, Defendant failed to raise the correct claim before the jury was sworn. At voir dire, trial counsel did not challenge the prosecution's use of peremptory challenges. Instead, the Batson claim was not raised until the case was on direct appeal to the supreme court.

Accordingly, we find that the applicable procedural barrier is waiver, rather than, as the post-conviction court held, that the issue was previously determined. *See* Tenn. Code Ann. § 40-30-112(b)(1) (repealed).

### B. Ineffective Assistance of Counsel - Batson Issue

Remaining is the issue of whether counsel was ineffective for failing to raise the

appropriate objection during *voir dire*. In order to show ineffective assistance of counsel, Defendant must first establish that the services rendered or the advice given was below ?the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that there is a reasonable probability that but for counsel's error, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984); Best v. State, 708 S.W.2d 421, 422 (Tenn. Crim. App. 1985).

At the time of voir dire proceedings, trial counsel was aware that Batson had been argued before the United States Supreme Court; however, he did not specifically object to the State's use of its peremptory challenges to exclude African-American jurors.

In reviewing whether counsel should have objected to the State's use of peremptory challenges, the court must determine whether counsel's performance was unreasonable under prevailing professional norms. Strickland, 466 U.S. at 688, 104 S.Ct. at 2065. Typically, counsel will not be found ineffective for failing to raise a violation of principles enunciated in a case which has not yet been decided at the time of trial. *See* Welch v. State, 836 S.W.2d 586, 590 (Tenn. Crim. App. 1992). However, under extraordinary facts, an attorney's failure to raise such a claim has been held unreasonable. *See* Virgin Islands v. Forte, 865 F.2d 59, 62-63 (3d Cir. 1989).

In Forte, although Batson had not yet been decided, the defendant and consulting defense counsel had directed trial counsel to preserve the Batson issue by objecting to the prosecutor's peremptory challenges based on race. *Id.* at 63. The court stated that its finding of ineffective assistance was narrowly based on the fact that trial counsel failed to honor her client's reasonable request that she make an objection to preserve his rights under a case then pending in the Supreme Court. *Id.*

The present case does not present such extraordinary circumstances. While trial counsel was aware that Batson had been argued in the United States Supreme Court at

the time of the voir dire proceedings, he did not make the correct objection. More than the failure to make an objection based on the mere knowledge of an undecided case is required before an attorney's performance may be held deficient. Accordingly, we find that trial counsel's performance was not deficient under Strickland.

## III. DISCOVERY RELATING TO BATSON ISSUE

Defendant contends that the matter should be remanded to the post-conviction court so that Defendant may take discovery and present evidence to show that the prosecutors in his case had consistently used peremptory challenges against potential African-American jurors in other cases. Because we find that Defendant's Batson claim was waived by his failure to raise it at trial and that trial counsel was not ineffective, we decline to remand the matter to the trial court for the discovery and presentation of evidence on the issue.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE

Defendant contends that trial counsel provided ineffective assistance by failing to investigate, develop, or prepare any elements of a mitigation case until after the guilty verdict was rendered; failing to offer the jury any meaningful mitigation; failing to investigate or defend against the aggravating factors raised by the State; and failing to be an adequate advocate for Defendant. Although we conclude trial counsel's performance was deficient, we conclude there has been no showing of prejudice.

### A. Investigation and Presentation of Mitigating Evidence

Defendant contends that trial counsel failed to investigate or prepare for the penalty phase. He contends that counsel was unaware of numerous family members and friends, two social work experts, and a church deacon who could have testified about the details of Defendant's character and background. Nor did counsel obtain affidavits from witnesses

who were unavailable to testify at trial. Specifically, Defendant contends that because of counsel's deficiencies, the jury was not given an opportunity to consider Defendant's character and background.

In death penalty cases, the sentencer may not be precluded from considering any aspect of a defendant's character or record as a basis for a sentence less than death. Lockett v. Ohio, 438 U.S. 586, 604-05, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978) (plurality opinion); *see also* Johnson v. Texas, 509 U.S. 350, 361, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993). The United States Supreme Court has held that mitigating evidence is relevant to sentencing hearings and should be heard. *See* California v. Brown, 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987); Eddings v. Oklahoma, 455 U.S. 104, 113-15, 102 S.Ct. 869, 876-77, 71 L.Ed.2d 1 (1982). ?{[E]vidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such excuse.'" Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (quoting Brown, 479 U.S. at 545, 107 S.Ct. at 841) (O'Conner, J., concurring)).

There is no legal requirement and no established practice that the accused must offer evidence at the penalty phase of a capital trial. State v. Melson, 772 S.W.2d 417, 421 (Tenn. 1989). In fact, in many death penalty cases, counsel has properly decided not to offer any evidence at the penalty phase. Id. at 421; see also State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985). However, the failure to investigate and prepare for a possible capital sentencing hearing is generally below the range of competence demanded of criminal defense attorneys. Zagorski v. State, 983 S.W.2d 654, 657 (Tenn. 1998).

At the post-conviction hearing in the present case, trial counsel testified that with the exception of what was going on in his mind prior to and during the trial, he did not do any formal preparation for the sentencing hearing until after the jury returned with a guilty verdict. He did not review Defendant's school or medical records. He talked with family

members, especially Defendant's mother, regarding Defendant's prior life. He talked with Defendant's mother before trial and prior to the penalty phase; however, he did not talk to her about testifying at the sentencing hearing until after the verdict was announced. All of his preparation was done during the three-hour period between proceedings. Trial counsel did not consult any mitigating experts, psychologists, or sociologists. His associate, who did most of the investigative work, testified that he did not work on the penalty phase. The assistant public defender who handled the case before trial counsel was retained testified that the mitigation investigator for the public defender's office went to St. Louis and would have gathered background information on Defendant. This information would have been given to retained counsel; however, no such information was found in his file.

## B. Deficiency Prong

We can only conclude that the utter failure of trial counsel to investigate and prepare for the possible capital sentencing hearing was clearly below the range of competence demanded of criminal defense attorneys. *See* Zagorski, 983 S.W.2d at 657. However, Defendant must also establish prejudice from this deficient performance in order to be entitled to relief. Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.

## C. Prejudice Prong

In Goad v. State, 938 S.W.2d 363 (Tenn. 1996), the supreme court set forth the following factors to consider in determining whether Defendant was prejudiced by counsel's deficiencies: (1) the nature and extent of available mitigating proof, (2) whether substantially similar proof was otherwise presented to the trier of fact, and (3) whether there was strong evidence of aggravating factors so that "the mitigating evidence would not have affected the jury's determination." *Id.* at 371.

These factors were recently applied in Henley v. State, 960 S.W.2d 572 (Tenn. 1997), *cert. denied*, 119 S.Ct. 82, 142 L.Ed.2d 64 (1998), where Defendant was convicted

of aggravated arson and two counts of premeditated murder. "At trial Henley maintained his innocence and attempted to discredit the prosecution's evidence . . . ." *Id.* at 574. At the penalty phase, the defense called the defendant's mother to the stand. In the presence of the jury, she disrupted her own testimony by announcing that she wanted "to talk to" defense counsel. A recess was had, followed by the defense resuming its proof by calling the defendant's grandmother, without explaining the failure of the defendant's mother to return to the stand. The grandmother testified to various attributes of the defendant, and the defendant himself testified about a financial reversal that caused him to lose his grandfather's farm. *Id.* at 575-76. The jury sentenced the defendant to death based upon finding one aggravating factor in each homicide, that each murder was "'especially heinous, atrocious, or cruel in that it involved torture or depravity of mind.'" *Id.* at 576; *see* Tenn. Code Ann. § 39-2-203(i)(5). In his post-conviction proceeding, Henley alleged that his counsel failed to investigate and prepare for the sentencing hearing, including the claims that counsel failed to investigate his mental condition and request an appropriate evaluation.

In addressing the prejudice issue first, see Strickland, 466 U.S. at 697, 104 S.Ct. at 2069, the supreme court found that any failure of counsel to call as witnesses family members, some of whom testified at the post-conviction hearing about the positive attributes of Defendant, was not prejudicial. Utilizing the first and second prongs of the three-prong test provided in Goad, the court noted that the proposed evidence not only duplicated but perhaps, due to its nature, would have diminished the poignant testimony of Henley's grandmother. Further, regarding the nature of the proposed testimony, the court acknowledged the principle of California v. Brown that a disadvantaged background is often a proper source of mitigating evidence, but expressed concern about the quality of witnesses having a limited relationship with Henley or having personal knowledge about his drug use at the time of the crimes. At this juncture, the court declared that "[a]ppellate courts must consider the quality of the proposed testimony rather than the quantity of witnesses when determining whether prejudice has been established." Henley, 960 S.W.2d at 582.

As to the third prong established in Goad, the Henley court observed that the proof of the aggravating circumstance was strong. *Id.* Defendant killed an elderly couple. He shot them several times and then burned them by setting fire to their house. The court found ample support for the single aggravating circumstance that the crime was especially heinous, atrocious, or cruel, involving torture or depravity of mind. *Id.*

## D. Goad Analysis

Under the three factors set forth in Goad, we must first look at the "nature and extent of the mitigating evidence that was available but not presented." Goad, 938 S.W.2d at 371. At the post-conviction hearing, Defendant presented testimony and affidavits of family members and friends. The witnesses who had testified at trial indicated that trial counsel never asked them any questions regarding Defendant's character or background. Witnesses who did not participate in Defendant's trial indicated that they would have been willing to testify if trial counsel had contacted them. This proof showed that Defendant lived in a housing project until he was ten or twelve years old. He was a sickly baby, and his father pampered him. Subsequently, the family moved to a nicer neighborhood. Defendant's father died shortly after the family moved, and Defendant's mother remarried. Defendant's stepfather, although a good man, was an alcoholic. Defendant's mother was a ?workaholic" and owned several properties. Defendant worked with his mother full-time remodeling and repairing these properties. He had a good relationship with his mother and was the mediator of family problems. Defendant's sons remembered him as being a good and loving father. Defendant also presented proof at the post-conviction hearing regarding the housing projects he lived in as a child and about the effects of urban living on young African-American males.

In reviewing the "quality of the proposed testimony," see Henley, 960 S.W.2d at 582, it would have been proper proof at a sentencing hearing. As in Henley, however, the evidence does not reveal a "disadvantaged background," nor does it suggest "emotional

and mental problems [that make Defendant] less culpable than defendants who have no such excuse." *See* Brown, 479 U.S. at 545, 107 S.Ct. at 841 (O'Conner, J., concurring).

As to the second factor offered in Goad, whether evidence similar to the proposed evidence had already been heard by the jury, testimony regarding Defendant's life, albeit less in depth, was presented to the jury at the guilt phase. Moreover, at the penalty phase, Defendant's mother testified that Defendant was an obedient and good son to her. She related that Defendant's father had died in 1968, and she had remarried. She testified that Defendant was brought up going to Sunday School and church. Defendant had always kept in touch with her and had helped provide for her from time to time. She asked the jury to spare her son's life and indicated that she was praying for everyone.

Moreover, some of the testimony presented at the post-conviction hearing would have contradicted the proof presented at the guilt phase. Specifically, at trial, Defendant testified that he had worked "a few jobs" through the years but that none had lasted for any long period of time. He testified that he was not working in October 1983; instead, his common law wife was receiving welfare, and he was doing odd jobs. Moreover, Defendant's mother testified that she did not know where Defendant had been working, and there were times she would not see him for months. At the post-conviction hearing, the testimony showed that Defendant worked with his mother on remodeling and repairing her properties. Several testified that Defendant was a hard worker. It would not have been credible to present such testimony at the sentencing hearing after Defendant himself had testified to his sporadic work history.

The third Goad factor, the competing strength of the aggravating factors, further illustrates that any deficient performance was not prejudicial. *See* Henley, 960 S.W.2d at 582. Here, the jury found three aggravating circumstances. However, we do note that the felony murder aggravator was clearly erroneous and this Court now questions the applicability of the great risk aggravator.

In State v. Howell, 868 S.W.2d 238 (Tenn. 1993), our supreme court commented that evidence of a previous conviction of a felony involving violence to the person under Tennessee Code Annotated § 39-2-203(i)(2) is an aggravating circumstance that is "more qualitatively persuasive and objectively reliable than others." *Id.* at 261. While none of Defendant's seven prior felony convictions were for murder, two were for attempted first degree murder. Moreover, the number of convictions must be considered in reviewing this aggravating circumstance qualitatively.

Based on the application of the factors set forth in Goad, the Court finds that Defendant has failed to demonstrate prejudicial ineffectiveness of counsel in preparing for and conducting a mitigation defense at the sentencing hearing. Specifically, it appears the quality of available mitigating proof would have been unpersuasive.

## E. *Voir Dire*

Defendant contends that counsel was ineffective by failing to use *voir dire* as an opportunity to "sensitize" the jury to Defendant's case. Defendant further submits that counsel was ineffective by failing to consider filing any motions relating to the *voir dire*, failing to request a special jury questionnaire, and by failing to use his time with the jurors during *voir dire* as an opportunity to get his penalty phase "message" across.

While voir dire may certainly be used to educate jurors on the sentencing process in a capital trial, the true purpose is to ensure that a fair and impartial jury is impaneled. The trial court properly instructed the jury on the law at the sentencing hearing, and the jury is presumed to have followed the instructions of the court. State v. Woods, 806 S.W.2d 205, 211 (Tenn. Crim. App. 1990).

Counsel's failure to "sensitize" jurors or educate them regarding consideration of punishment did not constitute ineffective assistance of counsel. Given counsel's trial strategy of an alibi defense at the guilt phase, refraining from asking questions about

-29-

sentencing could have been employed as a tactical decision. Moreover, because the jurors were sufficiently questioned to ensure that a fair and impartial jury was impaneled, Defendant has shown no prejudice.

## F. Investigation and Defense Against Aggravating Circumstances

Defendant contends that trial counsel was ineffective by failing to provide an affirmative defense to the aggravating circumstances proven by the State. Specifically, he submits that counsel should have investigated and shown that Defendant could not have fired the shot which grazed a customer during the robbery and which was used to support the aggravating circumstance that Defendant put two or more persons at great risk of death. He also submits that trial counsel should have shown the jury that the seven prior violent felonies were the result of one incident.

As noted earlier, at the post-conviction hearing, Defendant presented the testimony of Robert A. Poole with the Dallas County Crime Lab. He testified that based on his review of the records, including the withheld police reports, he could say with reasonable scientific certainty that the gunman who shot the victim did not fire the bullet that grazed a customer. Trial counsel testified that he did not consult with a ballistics expert, nor did he visit the crime scene. Defendant also presented the affidavit of Dr. Charles S. Petty. In Dr. Petty's expert opinion, it would be extremely rare for a single bullet fired from a handgun to kill two persons.

Counsel was not deficient in failing to establish that defendant did not fire the shot that grazed the bystander. As previously stated, the crime scene report had been withheld from him. We must evaluate counsel's conduct from his perspective at that time, not on the basis of hindsight. Strickland, 466 U.S. at 689, 104 S.Ct. at 2065.

As to the prior convictions, each represented a separate conviction regardless of the fact that all seven offenses were committed at the same time. The informations read to

the jury contained the same date of conviction, and in each case the victim or victims were named. In addition, the shots fired by Defendant in California hit two people and nearly struck a child. Highlighting these circumstances and injuries would have rendered any argument by counsel regarding the single episode highly questionable. This issue is without merit.

### G. Advocacy at the Penalty Phase

Defendant contends that trial counsel was ineffective in the penalty phase by waiving opening argument, by failing to make necessary objections to the prosecutor's closing argument, by failing to adequately question Defendant's mother, and by giving an incompetent closing argument.

Regarding trial counsel's decision not to present an opening statement at the penalty phase, Defendant has failed to show that this was error. There is no requirement that an opening statement be made. Moreover, trial counsel was not questioned at the post-conviction hearing regarding his reasons for not giving an opening statement. The same is true as to counsel's direct examination of Defendant's mother. The record does not support the claim of ineffective assistance.

Next, Defendant contends that trial counsel failed to object during the prosecutor's closing argument. The State made several improper arguments to the jury to which trial counsel did not object. Initially, the State's attorney stated, "I guess all my life I was in law enforcement. I was a special agent for the FBI before that, so I guess I enjoy that kind of thing." See State v. Harries, 657 S.W.2d 414, 421 (Tenn. 1983) (improper for prosecutor to refer to facts not in evidence). He also argued, "And if I thought it would honestly do Erskine Johnson any good to sentence him to life in our penitentiary, if that would rehabilitate him, I would tell you to do that," and "[i]f I sincerely could look you in the eye and tell you to give him life and maybe he'll be rehabilitated, I would ask you to do that. But I don't think that's the case here." See Coker v. State, 911 S.W.2d 357, 368 (Tenn.

Crim. App. 1995) (prosecutor must not express a personal belief or opinion). The State's attorney then delivered an argument regarding deterrence. See State v. Bates, 804 S.W.2d 868, 881-82 (Tenn. 1991) (issue of specific or general deterrence should be avoided by the prosecution in closing argument at a capital sentencing hearing). Trial counsel failed to object to these statements by the prosecutor.

While the State's arguments were clearly improper and trial counsel should have objected, Defendant has failed to show prejudice. As pointed out in State v. Irick, 762 S.W.2d 121 (Tenn. 1988), in reviewing the propriety of argument in a capital sentencing proceeding, the reviewing court must determine whether the prosecutor's comments affected the sentencing decision. *Id.* at 131. ?If the Court cannot say the comments had no effect on the sentencing, then the jury's decision does not meet the standard of reliability required by the Eighth Amendment." *Id.* (citing Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 2646, 86 L.Ed.2d 231 (1985)). From our review of the record, including the trial court's numerous instructions to the jury that argument and statements of counsel were not to be considered as evidence, the Court finds that the prosecutor's closing argument did not affect the jury's sentencing decision nor did his comments create a cumulative effect that would reflect prejudice. Thus, the prejudice prong in Strickland has not been satisfied.

Defendant next contends that trial counsel's closing argument was ineffectual. Specifically, he contends that the argument was short and was totally devoid of content. He points to one statement by counsel as particularly ineffective: "I don't know if I can argue that Erskine's a good enough man that he deserves to continue to live." Although not cited by Defendant, trial counsel went on to argue, "Counsel seems to be arguing that he's such a bad man that he doesn't deserve to live. But that's a decision that you have to make, that you hold in your hands." Taken in context, it appears that trial counsel was trying to emphasize to the jury its, not the prosecution's, duty to decide the appropriate sentence. As to the brevity of the argument, Defendant has not met the prejudice prong of Strickland. Having reviewed trial counsel's closing argument, we do not find that it

-32-

constituted ineffective assistance.

## H. Ineffective Assistance at the Guilt Phase

Defendant contends that trial counsel was ineffective by failing to investigate Beverly Batts, resulting in a flawed cross-examination of her; by failing to adequately investigate and prove the alibi defense; and by failing to object to the prosecution's repeated improper conduct.

## I. Cross-Examination of Beverly Batts

Defendant contends that trial counsel was ineffective by failing to ask Defendant's California attorneys for information regarding Beverly Batts. At the post-conviction hearing, Defendant presented an affidavit from his California trial counsel which indicated that he had in his possession a police report showing that Ms. Batts had lied to the police and attempted to falsely implicate someone in a crime in order to protect herself from prosecution.

While it would have been helpful for trial counsel to have had this information to further impeach Ms. Batts, it is clear from a review of her testimony that her character did not remain untarnished. At trial, Ms. Batts admitted that in November 1984, she was convicted in California of accessory to armed robbery. During cross-examination, Ms. Batts also admitted that she had asked Defendant to help her make bond in California and that she was unhappy with him when he failed to do so. She also admitted that she was granted immunity in exchange for testifying against Defendant in California. Regardless of whether or not counsel was ineffective by failing to ask Defendant's California attorneys for information, based on trial counsel's cross-examination of Ms. Batts, Defendant has failed to show prejudice and is not entitled to relief on this claim.

## J. Trial Counsel's Investigation and Presentation of Alibi Defense

Defendant contends that trial counsel neither adequately investigated nor appropriately presented the alibi defense during the guilt phase. Specifically, he contends that counsel was ineffective by failing to interview all alibi witnesses before determining which should testify at trial and by failing to present affidavits from those witnesses who were unable to attend the trial. In support of this claim, Defendant presented testimony and affidavits of additional witnesses who would have been willing to testify in support of Defendant's alibi defense. Defendant also contends that trial counsel was ineffective by failing to introduce proof, such as his mother's driver's license, to show that October 1, 1983, was in fact her birthday. Defendant points out that the prosector emphasized this lack of evidence during closing argument.

At trial, the defense presented seven alibi witnesses, including two friends of the family, Defendant himself, his mother, his two sisters, and his girlfriend. All testified that they saw Defendant at his mother's birthday party on October 1 and 2, 1983. The list of potential alibi witnesses provided before trial consisted of over twenty-five names, including those who testified at the post-conviction hearing. The witnesses at the post-conviction hearing testified that they would have been willing to testify, but were never interviewed or asked to testify. These witnesses testified they did not know about the trial until after they were notified concerning these post-conviction proceedings.

Trial counsel testified that he received a list of potential alibi witnesses from Defendant. He attempted to contact all the people on the list and asked Defendant's mother to find those without a correct phone number or address. With regard to the number of alibi witnesses who came to testify, associate counsel testified that it was the number they believed to be appropriate. He also testified that the attorneys, the Defendant, and his family discussed the potential witnesses and together decided which could provide relevant testimony.

At the post-conviction hearing, the Defendant presented documentation of his mother's birth date as being October 1, 1926. At trial, no such documentation was

presented. During closing argument, the prosecutor made the following argument regarding this fact:

> Did anybody show us anything to tell us that there was in fact a birthday on that date? All we needed was Florence Bowman to open up a driver's license and say, now here's my birthday, or anything. We didn't have that.

In denying this claim, the post-conviction court found that trial counsel had developed a reasonable strategy and defense in the guilt phase and had presented a strong case of alibi. The court found that the alibi witnesses who testified were selected because the Defendant, his mother, and both attorneys thought they were the best of the group to present Defendant's case. The court noted that there is a "constant danger that if one presents too many witnesses on the same subject that on cross-examination they can be tripped up and sometimes major inconsistencies shown that will destroy the alibi defense." The court found that the "downfall of the defense, although ably presented, was the unanswered, unexplained left palm print of Defendant found in the top right passenger side of the getaway vehicle."

The findings of fact and conclusions of law made by the post-conviction court are given the weight of a jury verdict, and this Court is bound by those findings unless the evidence contained in the record preponderates otherwise. Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990); Teague v. State, 772 S.W.2d 932, 934 (Tenn. Crim. App. 1988). Moreover, this Court must defer to trial strategy and tactical choices when they are informed ones based upon adequate preparation. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Clearly, the decision of which alibi witnesses to call was a matter of trial strategy. This issue is without merit.

### K. Trial Counsel's Failure to Object to Improper Closing Arguments

Defendant contends that counsel was ineffective by failing to object to the prosecutor's comments during argument in which he bolstered the testimony of the investigating officer, stated his personal opinion that Ms. Batts was telling the truth, and made a victim impact argument.

As noted by the State, upon request of trial counsel, the jury was instructed numerous times throughout the trial that they were not to consider the statements of counsel as evidence and that they were only to consider evidence that came from the witness stand. It is presumed that the jury followed the trial court's instructions in this regard. State v. Woods, 806 S.W.2d 205, 211 (Tenn. Crim. App. 1990). Moreover, as noted by the post-conviction court, victim impact proof was admissible at the time of trial. Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), overruled by Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), was not released until June 15, 1987. Defendant has failed to show that trial counsel was ineffective on these grounds.

## L. Exclusion of Evidence Concerning Adequate Defense in a Capital Case

Defendant contends that the post-conviction court erred by excluding from evidence an article from the Tennessee Law Review entitled Defending Life In Tennessee Death Penalty Cases, the Tennessee Association of Criminal Defense Lawyers manual entitled Tools for the Ultimate Trial, and the testimony of William Redick, formerly with the Capital Case Resource Center, regarding the conduct of trial counsel in this case.

In Strickland v. Washington, 466 U.S. at 688, 104 S.Ct. at 2067, the Supreme Court indicated that the assessment of whether counsel provided effective assistance involves a comparison of defense counsel's conduct to "prevailing professional norms." While the Court did not specifically hold that expert testimony was appropriate or necessary, the more prudent ruling in the present case would have been to allow the testimony and exhibits to be introduced as evidence of the professional norms in capital cases at the time of Defendant's trial, regardless of the weight given to such proof. However, having

reviewed Defendant's offer of proof, the Court does not find that it would have entitled Defendant to post-conviction relief.

# V. __MIDDLEBROOKS__ ERROR

Defendant submits that it was error for the State to use the felony murder aggravating circumstance in sentencing him to death, and he contends that such error was prejudicial. Defendant was convicted of felony murder, and the felony murder aggravating circumstance was applied by the jury in sentencing him to death. In State v. Middlebrooks, the Tennessee Supreme Court held that the State is precluded from using felony murder as an aggravating circumstance when the underlying conviction is felony murder. 840 S.W.2d at 346. In State v. Howell, 868 S.W.2d 238 (Tenn. 1993), the supreme court adopted a harmless error analysis for reviewing whether resentencing is required where the felony murder aggravating circumstance has been applied to a felony murder conviction.

Defendant argues that the Middlebrooks error was not harmless because the two remaining aggravating factors are weak. First, he argues that there was insufficient proof of the aggravating circumstance that he created a great risk of death to two or more persons other than the murdered victim. He further argues that the ?prior violent felony" aggravating circumstance was weak because the seven convictions were the result of a single incident. Moreover, while he concedes that this argument has been rejected by Tennessee courts, *see* State v. Hodges, 944 S.W.2d 346, 357 (Tenn. 1997), he argues that the convictions should not have been considered because they occurred nine months after this murder.

In Howell, the supreme court held that:

> In order to guarantee the precision that individualized sentencing considerations demand and provide a principled explanation for our conclusion in each case, it is important, when conducting harmless error review, to completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed.

868 S.W.2d at 260-61. These factors include, without limitation, the following:

(1) The number and strength of remaining valid aggravating circumstances.
(2) The prosecutor's argument at sentencing.
(3) The evidence admitted to establish the invalid aggravator.

(4)     The nature, quality, and strength of the mitigating evidence.

*Id.* at 261.

The Howell court recognized that "more crucial than the sum of the remaining aggravating circumstances is the qualitative nature of each circumstance, its substance and persuasiveness, as well as the quantum of proof supporting it." Id. at 261. This is particularly true of the ?prior violent felony" aggravator; and its effect and qualitative persuasiveness increases where there is proof, as in this case, of more than one prior violent felony conviction. State v. Nichols, 877 S.W.2d 722, 738 (Tenn. 1994).

We first examine the number and strength of the remaining valid aggravating circumstances. Although the jury found the Defendant knowingly created a great risk of death to two or more persons, other than the victim murdered, during his act of murder, the state's failure to reveal exculpatory evidence tends to negate this aggravating circumstance.

The other aggravating circumstance of prior convictions for violent felonies is admittedly strong. Defendant contends this aggravating circumstance should be given less weight because all seven convictions were the result of a single incident. Regardless of the number of incidents involved, Defendant was convicted of seven prior felonies involving violence.

Next, we consider the prosecutor's argument at sentencing. The prosecution did not focus on the felony murder aggravating circumstance. During closing argument, the prosecutor made one statement, "There's no question in one of the aggravating circumstances, that this murder was committed during the perpetration of an attempted armed robbery." During rebuttal, the prosecutor read to the jury the felony murder aggravator and stated, "By your verdict you have set that out." These were the only comments made regarding this aggravating circumstance.

Next, we consider any evidence admitted to establish the invalid aggravator. Here, the State did not present any evidence on this aggravator at the sentencing hearing. In fact, the only proof presented at the sentencing hearing by the State was documentation of Defendant's seven prior convictions.

Finally, this Court must consider the nature, quality, and strength of the mitigating evidence. At the sentencing hearing, the defense presented the testimony of Defendant's mother. As found by the post-conviction court, the testimony of Defendant's mother was emotional. She told about Defendant's background and how he had been a good son. Invoking God and Jesus Christ, she asked the jury to spare her son's life. She continued her testimony as she left the witness stand, eventually walking out of the courtroom, and then returning with a few last words.

The erroneous application of the felony murder aggravator must be considered along with the exculpatory evidence withheld from the defense and jury relating to the great risk aggravator. Since the felony murder aggravator is clearly erroneous and the great risk aggravator was arguably misapplied, we are unable to conclude that the jury would have sentenced the Defendant to death based solely on the prior violent felonies aggravator. Thus, a remand for resentencing is necessary.

## VI. JURY INSTRUCTIONS

Defendant contends that the jury instruction directing the jury that it was to determine whether he was guilty beyond a reasonable doubt and to a moral certainty was misleading and vague in violation of the Fourteenth Amendment to the United States Constitution. We disagree.

In several cases, this Court has upheld similar instructions as consistent with constitutional principles. See Pettyjohn v. State, 885 S.W.2d 364, 365-66 (Tenn. Crim. App. 1994); State v. Hallock, 875 S.W.2d 285, 294 (Tenn. Crim. App. 1993). Moreover,

our supreme court has held that "the use of the phrase 'moral certainty' by itself is insufficient to invalidate an instruction on the meaning of reasonable doubt." Carter v. State, 958 S.W.2d 620, 626 (Tenn. 1997). This issue is without merit.

While recognizing that our supreme court has previously upheld the death penalty statute against constitutional challenges, Defendant attacks the constitutionality of the jury instructions in order to preserve these arguments for later review. With one exception, the post-conviction court correctly held that these claims have been waived by Defendant's failure to raise them at trial and on direct appeal. *See* Tenn. Code Ann. § 40-30-112(b)(1). Defendant's claim that the jury instructions on the "great risk of death" aggravating circumstance are impermissibly vague was rejected by our supreme court in Defendant's direct appeal, State v. Johnson, 762 S.W.2d at 119; and thus, is previously determined. *See* Tenn. Code Ann. § 40-30-112(a). Regardless, as noted by Defendant, these challenges have all been rejected by our supreme court. *See, e.g.*, State v. Smith, 893 S.W.2d 908, 926 (Tenn. 1994); State v. Brimmer, 876 S.W.2d 75, 86-87 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253, 268 (Tenn. 1994); State v. Van Tran, 864 S.W.2d 465, 478 (Tenn. 1993); State v. Smith, 857 S.W.2d 1, 22-23 (Tenn. 1993); State v. Bane, 853 S.W.2d 483, 488 (Tenn. 1993); State v. Black, 815 S.W.2d 166, 179 (Tenn. 1991); State v. Bates, 804 S.W.2d 868, 883 (Tenn. 1991); State v. Payne, 791 S.W.2d 10, 21 (Tenn. 1990); State v. Barber, 753 S.W.2d 659, 670-71 (Tenn. 1988); State v. King, 718 S.W.2d 241, 249 (Tenn. 1986).

## VII. CONSTITUTIONALITY OF DEATH PENALTY STATUTES

Defendant raises several challenges to the constitutionality of Tennessee Code Annotated §§ 39-2-204 and 206. Our supreme court has repeatedly rejected these arguments, even in Defendant's direct appeal. Johnson, 762 S.W.2d at 118-19; *see also*, State v. Nichols, 877 S.W.2d 722; Brimmer, 876 S.W.2d at 86-88; Cazes, 875 S.W.2d at 268, 270-71; Howell, 868 S.W.2d at 258; Smith, 857 S.W.2d at 23; State v. Caughron, 855 S.W.2d 526, 542 (Tenn. 1993); State v. Evans, 838 S.W.2d 185, 196 (Tenn. 1992); Black,

815 S.W.2d at 179; <u>State v. Barber</u>, 753 S.W.2d at 664. The Tennessee death penalty statutes are constitutional. <u>State v. Middlebrooks,</u> ___ S.W.2d ___ (Tenn. 1999).

## VIII.  CUMULATIVE EFFECT OF ERRORS

Defendant contends that the cumulative effect of all errors at trial, sentencing, and on appeal violated his right to due process as guaranteed by the United States and Tennessee Constitutions.  We have concluded Defendant is entitled to a new sentencing hearing.  Based upon our review, we reject Defendant's contention that the cumulative effect of errors relating to the guilt phase of trial require reversal.

## IX.  DEFENDANT'S INNOCENCE

To the extent innocence is a required element of any claim for relief, Defendant maintains that he is innocent.  The jury found Defendant guilty of felony murder, and our supreme court held that the evidence was sufficient to support the verdict of the jury. <u>State v. Johnson</u>, 762 S.W.2d at 115-16.

## X.  CONCLUSION

It is indeed regrettable that almost 15 years after the original trial, we must now remand this case for a new sentencing hearing.  There were numerous items of exculpatory evidence wrongfully withheld from the defense, although most did not meet the <u>Brady</u> materiality test.  However, after thoroughly reviewing the record and the law applicable to the issues raised in this appeal, we conclude the state's failure to disclose exculpatory evidence relating to the great risk aggravator combined with the erroneous application of the felony murder aggravator necessitates a new sentencing hearing.  As to all issues relating to the guilt phase of the trial, Defendant is entitled to no relief.  The judgment of the trial court is affirmed as it relates to those issues.

_____
**JOE G. RILEY, JUDGE**


**CONCUR:**


___See Separate Opinion_____
**DAVID H. WELLES, JUDGE**


_____
**DAVID G. HAYES, JUDGE**